AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

**FILED**
United States District Court
Albuquerque, New Mexico
_____
Mitchell R. Elfers
Clerk of Court

# UNITED STATES DISTRICT COURT
for the
District of New Mexico

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.   24-MR-168 |
| Facebook Accounts 100012600640714, 100025955370368, and 100040061264313, stored at premises controlled by Meta Platforms, Inc. | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Northern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 113(a)(3) & 1153 | Assault with a dangerous weapon committed in Indian Country |

The application is based on these facts:

See attached Affidavit in Support of an Application for a Search Warrant, attached hereto and incorporated herein, submitted by SA Travis Kosir and approved by AUSA Mark Probasco.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days: _____ )* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Travis Kosir
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
__telephonically sworn and electronically signed__ *(specify reliable electronic means).*

Date:   1/26/2024

_____
*Judge's signature*

City and state:  Farmington, NM

B. Paul Briones, U.S. Magistrate Judge
_____
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH FACEBOOK ACCOUNTS 100012600640714, 100025955370368, and 100040061264313 THAT ARE STORED AT PREMISES CONTROLLED BY META PLATFORMS, INC. | Case No. _____ <br><br> **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Travis Kosir, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook accounts that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California, within the Northern District of California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the account.

2.      I am a Special Agent of the Federal Bureau of Investigation ("FBI"), where I have been employed in that capacity since March 2016. I am currently assigned to the Albuquerque Division of the FBI, Farmington Resident Agency, and have primary investigative responsibility for crimes that occur in Indian Country, including violent crimes such as homicide, robbery, arson, aggravated assault, and sexual assault. My law enforcement experience includes, but is not

limited to, collecting evidence, interviewing subjects and witnesses, writing affidavits for and executing search warrants, conducting surveillance, supervising cooperating sources, issuing subpoenas, analyzing phone records, and analyzing financial records. I am trained and have experience in the investigation of murder, assault, sex abuse, and other violent crimes committed in Indian Country. I have training and experience conducting investigations involving the use of social media and other forms of electronic communication, including executing search warrants and reviewing data.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 113(a)(3) & 1153: Assault with a Dangerous Weapon in Indian Country, (the "Target Offenses"), have been committed by Larence Cambridge, year of birth 1990, (referred to hereinafter as "CAMBRIDGE").  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## STATUTORY AUTHORITY

5.      CAMBRIDGE and the alleged victim in this case (C.Y. with the year of birth of 1978, hereinafter "JANE DOE") are both enrolled members of the Navajo Nation Indian tribe, a federally recognized tribe.

6.     The crimes described in this affidavit occurred in vicinity of GPS coordinates N36°47.096 W108°40.677, which is within the exterior boundaries of the Navajo Nation Indian Reservation.

**PROBABLE CAUSE**

7.     On or about January 09, 2024, the Albuquerque Division, Farmington Resident Agency of the FBI was notified by Navajo Nation Department of Criminal Investigations ("NNDCI") of a shooting which occurred on U.S. Highway 64 in Shiprock, NM. within the exterior boundaries of the Navajo Nation Indian Reservation. Navajo Police Department ("NPD") officers and emergency medical personnel responded to an emergency call and identified JANE DOE with an apparent gunshot wound to her leg. JANE DOE was transported to Northern Navajo Medical Center ("NNMC") in Shiprock, NM for medical treatment.

8.     On or about January 09, 2024, investigators from the FBI and NNDCI observed JANE DOE's vehicle parked along the side of U.S. Highway 64. Investigators observed what appeared to be three bullet holes in the driver door and one hole in the driver side rear passenger door of JANE DOE's vehicle. Investigators also observed what appeared to be blood stains on the roadway immediately below the driver door of JANE DOE's vehicle. JANE DOE's husband, who arrived on scene after the incident, provided consent to search the vehicle. Investigators located what appeared to be a fired bullet on the driver seat runner board inside JANE DOE's vehicle.

9.     On or about January 09, 2024, investigators from the FBI and NNDCI conducted a search of the public roadway where the reported shooting took place and located two empty 9mm Winchester cartridge casings approximately 20-30 feet behind JANE DOE's parked vehicle.

3

10.     Following NPD's initial response to the scene, NPD officers located a red Dodge Caravan matching the description provided by witnesses of the vehicle involved in the incident parked behind a residence in Shiprock, NM. NPD encountered multiple individuals at the residence who were later interviewed, as described below, leading to the identification of the parked vehicle as the suspect vehicle involved in the shooting.

11.     On or about January 09, 2024, investigators from the FBI and NNDCI interviewed an individual identified by initials C.B. and year of birth 1966 (referred to hereinafter as "WITNESS 1"). WITNESS 1 stated she was driving into Shiprock at approximately 1:30pm that day and saw an older model maroon van with Utah license plates and tinted windows pulled off to the side of U.S. Highway 64 near the Flowing Water Casino. WITNESS 1 observed a female jump out of the sliding door on the passenger side of the van and start walking east towards Farmington. The female appeared to be young, 17 or 18 years old and wore her hair up in a bun on top of her head. A male jumped out of the door behind the female and started chasing the female. The male was skinny, no facial hair, and wore black pants. The female was angry and did not want to go with the male. The male jumped back into the van and drove west toward Shiprock. WITNESS 1 then saw a red truck headed into Shiprock pull off the side of the road near the Chapter house after the maroon van passed it. WITNESS 1 followed the van to the stoplight and observed the van swerving all over the road. The van ran the red light and headed south out of Shiprock. WITNESS 1 called 911 because she believed the driver of the van was intoxicated.

12.     On or about January 09, 2024, investigators from the FBI and NNDCI interviewed an individual identified by initials J.W. and year of birth 1985 (referred to hereinafter as "WITNESS 2"). WITNESS 2 stated at approximately 1:00pm earlier that day he

walked over to his neighbor's residence to ask an individual identified by initials S.K. and year of birth 1989 (referred to hereinafter as "WITNESS 3") for a ride to the store. WITNESS 3 gave WITNESS 2 a ride to the Gulf gas station in Shiprock in her dad's red van. WITNESS 3 mentioned the van was hot or the police were looking for it. WITNESS 3 told WITNESS 2 she was hanging out with CAMBRIDGE earlier that day playing pool at her friend's house on U.S. Highway 64 across from the casino. CAMBRIDGE got into a fight with his girlfriend, an individual identified by initials T.P. and year of birth 1999 (referred to hereinafter as "WITNESS 5"), over a backpack. CAMBRIDGE and WITNESS 5 both walked off. WITNESS 3 finished playing pool and picked CAMBRIDGE up in the red van. CAMBRIDGE called WITNESS 5 and kept asking WITNESS 5 to give him back his backpack but she would not give it back, so CAMBRIDGE shot at WITNESS 5's ride. WITNESS 5 texted CAMBRIDGE back and told him he shot her aunt. When WITNESS 2 and WITNESS 3 arrived back at WITNESS 3's residence the cops showed up.

13.   On or about January 09, 2024, investigators from the FBI and NNDCI interviewed an individual identified with initials M.K. and year of birth 1980 (referred to hereinafter as "WITNESS 4"). WITNESS 4 stated around 9:00am that morning she walked over to her friend's residence down the road to ask WITNESS 3 if she could take WITNESS 4's kids to school because they missed the bus. WITNESS 4 walked home and shortly after WITNESS 3 showed up in a red van and took WITNESS 4 and her children to Shiprock High School. After dropping off the children, WITNESS 3 drove home briefly to grab her ID. WITNESS 3 wanted to go pick up her friend, WITNESS 5, and go play pool. WITNESS 3 drove to a female friend's residence behind Pro Tow in Shiprock where WITNESS 5 and her boyfriend, Larence got into the van. WITNESS 4 knew the first name of WITNESS 5's boyfriend to be "Larence," but did

5

not know his last name. The boyfriend named Larence wanted alcohol, so they drove to the gas station in Hogback to purchase alcohol. At approximately 11:00am, WITNESS 3 purchased Importers Vodka from the Hogback store. All four of them (CAMBRIDGE, WITNESS 3, WITNESS 4, and WITNESS 5) then drove to the house of WITNESS 3's friend, a residence near Hogback just off of U.S. Highway 64. WITNESS 5 and her boyfriend Larence got into an argument, and both walked off from the residence. WITNESS 5 called someone for a ride who drove a maroon truck. WITNESS 4 saw WITNESS 5 jump into the maroon truck. Shortly after, WITNESS 3 finished her pool game. WITNESS 3 and WITNESS 4 jumped back into the red van and headed toward Shiprock. WITNESS 3 was driving and WITNESS 4 was in the front passenger seat. WITNESS 4 saw Larence walking down U.S. Highway 64, so they stopped and picked him up. Larence got into the front passenger seat and WITNESS 4 got in the back seat of the van. Larence wanted his bag back from WITNESS 5 and told WITNESS 3 to pull up next to the maroon truck on U.S. Highway 64 near the Shiprock Chapter House. WITNESS 3 slowed down next to the maroon truck. WITNESS 4 heard "pop pop" four times and saw Larence hanging out of the passenger window with a bandana on his face. Larence was shooting a black handgun downward, towards the maroon truck. The maroon truck immediately pulled off the side of the highway. Larence said "go go." WITNESS 3 sped up driving, running both red lights heading south on Highway 491 through Shiprock. WITNESS 3 dropped Larence off at an associate's hogan by the water towers. Larence took the gun with him, which WITNESS 4 saw him put in a black plastic container. WITNESS 3 appeared to be panicky. WITNESS 4 did not believe WITNESS 3 knew what was going to happen. Larence never threatened WITNESS 3 nor WITNESS 4.

14.     On or about January 09, 2024, I interviewed JANE DOE at NNMC. JANE DOE stated earlier that day she was driving from Shiprock, NM heading to her home in Farmington, NM when she saw her niece, previously identified WITNESS 5, walking along the side of the road. JANE DOE picked up WITNESS 5 and started driving back toward Shiprock in order to drop WITNESS 5 off at her residence in Shiprock. While they were driving, JANE DOE saw the maroon van parked along the side of the road and a female was walking away from the it. JANE DOE continued driving past the van. Farther down the road, the van passed JANE DOE's truck and continued swerving through traffic ahead of JANE DOE. When JANE DOE got near the Shiprock Chapter House, she heard two loud pops immediately before the van sped past the left side of her vehicle heading in the same direction as her. JANE DOE observed a young Native American male with short hair wearing a handkerchief over his face with his upper body out of the front passenger window of the van. The male was holding a handgun near the right side of his head. JANE DOE felt pain in her left leg then looked down and saw blood. JANE DOE asked WITNESS 5 if she knew who that was, but WITNESS 5 did not say anything in response. JANE DOE did not recognize the male with the handgun. JANE DOE told WINTESS 5 to call 911. During the interview, JANE DOE rated her level of pain as a ten on a scale of one to ten.

15.     JANE DOE knew that WITNESS 5's ex-boyfriend was CAMBRIDGE and that they had a two-year-old child together. CAMBRIDGE did not like JANE DOE's family and knew what JANE DOE's truck looked like.

16.     Immediately prior to the interview with JANE DOE, I was present for a discussion between JANE DOE and her attending doctor. JANE DOE was informed that the bullet had hit a major blood vessel in her left leg, and she would require additional surgery

beyond the capabilities of NNMC. Later that evening JANE DOE was transported to a medical facility in Grand Junction, CO for additional procedures.

17.     Following the interview with JANE DOE, I observed the red Dodge Caravan located by NPD parked behind a residence in Shiprock, NM as described previously. I observed two electronic devices, one cellular telephone and one tablet, in plain view on the front passenger seat as well as what appeared to be a baseball bat near the center console.

18.     On or about January 10, 2024, NNDCI Criminal Investigator Dean Goldtooth contacted CAMBRIDGE's mother. CAMBRIDGE's mother confirmed the spelling of CAMBRIDGE's full name and his date of birth. CAMBRIDGE's mother also confirmed that CAMBRIDGE was dating WITNESS 5.

19.     On or about January 11, 2024, I and CI Goldtooth interviewed WITNESS 5. WITNESS 5 stated that on or about January 09, 2024 she was with WITNESS 3, WITNESS 4, and CAMBRIDGE at a residence near Hogback, NM when CAMBRIDGE became upset and walked off. WITNESS 5 walked off from the residence a little while later and was picked up by JANE DOE who was driving by. JANE DOE started driving towards Shiprock, NM to drop WITNESS 5 off at her house. While they were driving, WITNESS 5 saw WITNESS 3's van parked along the side of the road and saw CAMBRIDGE jump into it. The van being driven by WITNESS 3 then passed JANE DOE's vehicle about three times. The van passed JANE DOE's vehicle a final time and WITNESS 5 heard multiple gunshots. JANE DOE said "I've been shot." WITNESS 5 saw CAMBRIDGE hanging out of the front passenger window of the van wearing a bandana and holding a gun.

20.     WITNESS 5 also stated that sometime after JANE DOE was shot, WITNESS 3 sent a text message to WITNESS 5 via Facebook Messenger, a popular social media messaging

application, which said something about CAMBRIDGE asking if WITNESS 5 was going to snitch on him. WITNESS 5 deleted the message after she read it. WITNESS 5's primary means of communication with CAMBRIDGE was through Facebook Messenger. WITNESS 5 provided profile names and descriptions for her Facebook account as well as the Facebook accounts of WITNESS 3 and CAMBRIDGE.

21.    On or about January 11, 2024, CI Goldtooth located publicly viewable Facebook accounts matching the descriptions provided by WITNESS 5 for the Facebook accounts of WITNESS 5, WITNESS 3, and CAMBRIDGE. The account matching the profile name and description provided by WITNESS 5 for WITNESS 5's own account contained a black and white profile photo of WITNESS 5 as she described. Review of the Facebook profile page's source code identified the Facebook user ID of the account to be 100012600640714. The account matching the profile name and description provided by WITNESS 5 for WITNESS 3's account contained photos of WITNESS 3 and a young female as described by WITNESS 5. Review of the Facebook profile page's source code identified the Facebook user ID of the account to be 100025955370368. The account matching the profile name and description provided by WITNESS 5 for CAMBRIDGE's account contained photos of CAMBRIDGE and WITNESS 5. The profile name displayed on the account was of a "Larence Cambridge." Review of the Facebook profile page's source code identified the Facebook user ID of the account to be 100040061264313.

22.    On or about January 11, 2024, I submitted a request to Meta for the preservation of Facebook accounts 100012600640714, 100025955370368, and 100040061264313 via their Law Enforcement Online Requests portal.

23.     Based on my training and experience I know that social media and other communication applications such as Facebook Messenger are often used in place of traditional text and/or multi-media messages and voice calls as a means of communications between two or more parties. I also know that individuals involved in criminal acts such as victims, witnesses, or suspects often communicate before, during, or after such events. These communications frequently contain information related to the behaviors, locations, others involved, and events leading up and following a specific act. In addition, these communications also frequently contain information following a specific event related to the event itself and any possible law enforcement response, especially when the involved parties have pre-existing relationships.

24.     Based on my training, experience, and the facts set for the above, I believe there is probable cause that WITNESS 5 communicated with WITNESS 3 and CAMBRIDGE using the identified Facebook Messenger accounts immediately before and/or after the shooting on or about January 09, 2024 which resulted in the injuries to JANE DOE. Furthermore, I believe there is probable cause that the content of these communications may be material and relevant to the shooting on or about January 09, 2024 and provide evidence related to the stated crime.

## **BACKGROUND CONCERNING FACEBOOK**[1]

25.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use their accounts to share

---

[1] The information in this section is based on information published by Meta on its Facebook website, including, but not limited to, the following webpages: "Privacy Policy," available at https://www.facebook.com/privacy/policy; "Terms of Service," available at https://www.facebook.com/legal/terms; "Help Center," available at https://www.facebook.com/help; and "Information for Law Enforcement Authorities," available at https://www.facebook.com/safety/groups/law/guidelines/.

communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

26.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

27.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

28.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

29.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

30.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video, and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

31.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

32.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

33.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as

webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

34.     Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

35.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

36.     Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

37.     In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform.  When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

38.     Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

39.     Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

40.     Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

41.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of

the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, location information retained by Meta may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

42.     Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

43.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

44.     Based on the foregoing, I request that the Court issue the proposed search warrant.

45.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving it on Meta.  Because the warrant will be served on Meta, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

46.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## REQUEST FOR SEALING

47.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Travis Kosir
Special Agent
Federal Bureau of Investigation

Sworn telephonically, signed remotely, and transmitted by email this   26th   day of January, 2024.

B. Paul Briones
UNITED STATES MAGISTRATE JUDGE

16

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

This warrant applies to information associated with Facebook accounts 100012600640714, 100025955370368, and 100040061264313 that are stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

**ATTACHMENT B**

**Particular Things to be Seized**

I.      **Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)     All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers;

(b)     All activity logs for the account and all other documents showing the user's posts and other Facebook activities from January 09, 2024 to present;

(c)     All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from January 09, 2024 to present, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)     All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)     All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, advertising ID, and user agent string;

(f)     All other records and contents of communications and messages made or received by the user from January 09, 2024 to present, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)     All "check ins" and other location information;

(h)     All IP logs, including all records of the IP addresses that logged into the account;

(i)     All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)     All information about the Facebook pages that the account is or was a "fan" of;

(k)     All past and present lists of friends created by the account;

(l)     All records of Facebook searches performed by the account from January 09, 2024 to present;

(m)     The types of service utilized by the user;

(n)     The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

2

(o)     All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(p)     Records of any Facebook accounts that are linked to the account by machine cookies (meaning all Facebook user IDs that logged into Facebook by the same machine as the account); and

(q)     All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**II.     Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 113(a)(3) & 1153: Assault with a Dangerous Weapon in Indian Country involving Larence Cambridge since January 09, 2024, including, for each user ID identified on Attachment A, information pertaining to the following matters:

(a)     The shooting on or about January 09, 2024;

(b)     Communications between WITNESS 3, WITNESS 5, and CAMBRIDGE using Facebook accounts 100012600640714, 100025955370368, and 100040061264313;

(c)     Evidence related to the possession, use, storage, or other activity of firearms and/or ammunition;

3

(d)     Evidence related to any threat(s), coercion, or attempts to influence witness cooperation with law enforcement;

(e)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(f)     Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(g)     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.